IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID FOWLER, TDCJ #2224136, §
§
           Petitioner, §
§
v. §
§        CIVIL ACTION NO. H-20-3982
BOBBY LUMPKIN, Director, §
Texas Department of Criminal §
Justice - Correctional §
Institutions Division, §
§
           Respondent. §

## MEMORANDUM OPINION AND ORDER

David Fowler has filed a Petition for a Writ of Habeas Corpus By a Person in State Custody under 28 U.S.C. § 2254 ("Petition") (Docket Entry No. 1), challenging a conviction for arson that was entered against him in Harris County, Texas. The Petition includes a supporting Memorandum (Docket Entry No. 1-1). Now pending is Respondent Bobby Lumpkin's Motion for Summary Judgment with Brief in Support ("Respondent's MSJ") (Docket Entry No. 22), arguing that Fowler is not entitled to relief on any of his claims. Fowler has replied with Petitioner's Motion for Dismissal of Charges and Conviction (Docket Entry No. 24). After considering all of the pleadings, the state court record, and the applicable law, the court will grant Respondent's MSJ and dismiss this action for the reasons explained below.

# I. **Background**

A local grand jury returned an indictment against Fowler in Harris County Case No. 1523977, accusing him of arson by setting fire to a vehicle belonging to the complainant.[1]  The indictment was enhanced for purposes of punishment with two additional paragraphs, alleging that Fowler had at least two prior felony convictions.[2]  A jury in the 180th District Court of Harris County, Texas, found Fowler guilty of arson as charged in the indictment.[3]  After Fowler admitted that the enhancement allegations in the indictment were true and stipulated that he had several other prior convictions,[4] the same jury sentenced him to 26 years' imprisonment in the Texas Department of Criminal Justice.[5]

On direct appeal, Fowler argued that the State failed to present sufficient evidence to prove beyond a reasonable doubt that he set fire to a vehicle owned by the complainant.[6]  The

---

[1]See Indictment, Docket Entry No. 23-10, p. 10.  For purposes of identification, all page numbers refer to the pagination imprinted by the court's Electronic Case Filing ("ECF") system.

[2]Indictment, Docket Entry No. 23-10, p. 10 (listing a 1989 conviction for theft as a third offender in Harris County Cause No. 0543054 and a 1991 conviction for robbery in Harris County Cause No. 0590301).

[3]Verdict on Guilt/Innocence, Docket Entry No. 23-10, p. 135.

[4]Court Reporter's Record - Punishment Proceedings, vol. 7, Docket Entry No. 23-18, pp. 11-13.

[5]Verdict on Punishment, Docket Entry No. 23-10, p. 142.

[6]Appellant's Brief, Docket Entry No. 23-5, p. 20.

intermediate court of appeals rejected that argument and affirmed the conviction after summarizing the evidence presented at trial as follows:

> Appellant and Demetrius Lee, the complainant, have known each other for more than forty years. In 2016, they entered into an agreement for appellant to purchase a white Chevrolet truck from Lee. At the time, a mechanic was completing repairs on the truck, and the truck was not in Lee's possession. According to Lee, the total purchase price of the truck was $2,500, and appellant paid Lee $700 as a down payment.[] Appellant offered to pay the remaining balance on the truck in $30 or $40 increments, which Lee did not consider to be a suitable arrangement. Lee proposed that they "keep [their] friendship agreement" while terminating their business agreement and that he return appellant's $700 down payment. Lee testified that he and appellant made plans to meet on September 16, 2016, for Lee to return appellant's down payment.

> Lee and his girlfriend, Bridget Nelson, lived in a house in northeast Houston. On September 15, 2016, the day before appellant and Lee were scheduled to meet, appellant stopped by Lee's house when Lee was not present. Appellant was "kind of acting erratically," and Nelson called Lee and passed her phone through the front door so Lee and appellant could speak. Nelson heard appellant ask Lee, "When can you pay me my money?" Lee told appellant, "I am giving you your money tomorrow." Appellant responded, "Well, okay, that's fine." Appellant then left Lee's house.

> Around 8:30 that evening, Lee and Nelson were at home when appellant returned to the house. Appellant started cursing and banging on the front door to the house, and Lee declined to speak further with appellant and stayed inside the house. At this time, a black truck was parked in Lee's driveway. Lee used this vehicle in his carpet-installing business. He testified that he owned this truck and that this was not the truck that was the subject of the agreement between him and appellant — that truck, which was white, was being repaired and was not located at Lee's house. Both Lee and Nelson testified that they had left a squeeze bottle containing lighter fluid sitting on their front porch.

Lee and Nelson then received a phone call from a family friend of Lee's, notifying them that they should go outside. At Lee's direction, Nelson looked through the peephole of the front door, which had a view of their driveway. She saw appellant "standing in front of our black truck squeezing something that he had in his hand and all I [saw] was flames." Nelson saw appellant squeeze lighter fluid onto Lee's black truck and she saw a fire ignite. Nelson went outside and walked about ten feet from the front door. She "locked eyes" with appellant, whom she had met on several occasions and whom she identified in court, before going back inside the house. She testified that the fire did not appear to be an accident, stating, "Because [appellant] had banged on the door maybe ten minutes prior, banging and screaming, telling [Lee] he want[ed] his money." Nelson stated that she had "no doubt" that appellant lit the fire that destroyed Lee's truck.

When Lee learned that appellant had lighter fluid in his hand, he looked outside and saw that appellant was holding a container of lighter fluid and that his black truck was burning. Lee described the fire as a "very good blaze," and he stated that he had a "very good view of it." He saw appellant speak to someone near his mailbox at the end of the driveway before leaving his property, and Lee called the police. Lee acknowledged on cross-examination that he did not witness appellant pour lighter fluid on his truck or set the truck on fire.

Lee testified that while police officers and firefighters were at his house investigating the fire, appellant called him. Lee put the call on speaker so officers could hear the call, and he asked appellant why he set the fire. Appellant responded, "I told you I wanted my money," and Lee replied, "I told you I was going to give you your money back tomorrow at 4:30." Appellant called Lee several times that evening, and, at one point, Lee offered to meet him at a nearby washeteria and to give him whatever money Lee had in his possession and the remainder of the down payment the next day, but appellant did not appear for this meeting.

While officers were still present at Lee's house, appellant returned to the scene, riding in the passenger seat of a car. Lee was speaking to an investigator at the time, and he told the investigator that appellant was the one who started the fire. The investigator informed other officers of what Lee had said, and the officers

detained appellant. Lee identified appellant as the perpetrator of the arson.

Houston Police Department Officer J. Hatcher was dispatched to Lee's house, where he saw a truck that had been burned along the hood and the dashboard. This did not look like an accidental fire to Hatcher; instead, "[i]t looked like it was set." Hatcher observed a container of lighter fluid located on the ground near the truck. Hatcher was present at Lee's house when appellant returned to the scene as a passenger in a car, and, after Lee identified appellant, Hatcher conducted a traffic stop of the vehicle. Before officers arrested appellant, appellant stated that he had come by Lee's house because Lee owed him money and Lee had told him to come to the house.

J. Eli, an arson investigator with the Houston Fire Department, was also dispatched to Lee's house, where he learned that the fire had been located around the hood and front windshield of the black truck. Eli examined the entire truck and saw that there was almost no damage to the truck's engine compartment, indicating that the cause of the fire was likely not mechanical or electrical. The damage from the fire was "contained to the dashboard and the windshield and mostly on the hood," although a hole had burned through the windshield and "scorched" a portion of the steering wheel and the driver's seat. Based on the burn pattern, Eli determined that the fire started on the outside of the truck. He also determined, based on the damage to the truck, the statements of Lee and Nelson, and the presence of the container of lighter fluid located close to the truck, that the fire was incendiary, "meaning that somebody started the fire." Eli collected swabs from the truck, as well as "a small amount of fire debris," and sent this material to be tested for the presence of accelerants.

G. Chapa is an "accelerant detection canine handler" for the Houston Fire Department, and he works with dogs who have been trained to detect the presence of various accelerants. He was dispatched to the scene, and he walked his canine around the truck. He was not able to get his canine up near the hood and windshield of the truck, where investigators believed the fire had started. Chapa's canine did not alert on any portion of the truck, nor did he alert on appellant. The canine did, however, alert on a patch of grass approximately twelve feet from the truck, and Chapa was told that this was the area

-5-

around where officers had found the container of lighter fluid. Chapa offered several reasons why an accelerant-detection canine would not alert on a person, including the possibilities that the person changed their clothes, washed their hands, had worn gloves, or did not have any accelerant on them. Chapa also testified that lighter fluid is typically packaged in a squeeze bottle, and that, when using this type of bottle, accelerant may not get on the user "because when you squeeze it, it projects [the fluid] away from you, instead of if you pour it, it could splash on you."

Emerald Nazareno, a forensic scientist with the Texas Department of Public Safety Forensic Arson Laboratory, conducted the technical review of the testing of the materials collected from the truck. The laboratory testing involved using a gas chromatograph/ mass spectrometer to test for the presence of ignitable substances. The testing of the swabs and debris involved in this case revealed the presence of "medium petroleum distillate," which includes substances such as paint thinners, paint strippers, and charcoal lighter fluids.

Ronald Magic, who had been friends with appellant for several years, testified on appellant's behalf. Magic testified that, on September 15, 2016, he first saw appellant around 3:00 or 4:00 p.m., when they gathered with others for a barbecue. At some point that evening, appellant received a phone call, which Magic heard because appellant had placed his phone on speaker. After the phone call, appellant asked Magic and another man if they could "take him over there," which Magic understood to be "the place where the person said he got part of [appellant's] money for him." Magic agreed to drive appellant, and they drove past Lee's house, where police were still present. Officer Hatcher then conducted a traffic stop on Magic's vehicle, and officers arrested appellant. Magic testified that the only times appellant was not in his presence from around 3:00 or 4:00 in the afternoon on September 15 to the time Hatcher stopped his vehicle were when appellant made two short trips to a convenience store across the street from the barbecue to purchase more beer. Magic had no personal knowledge "of any kind of arson at all."

Fowler v. State, No. 01-18-00883-CR, 2019 WL 6314907, at *1-3 (Tex.

App. — Houston [1st Dist.] Nov. 26, 2019) (mem. op., not designated

for publication) (footnote omitted).[7]  Thereafter, the Texas Court
of Criminal Appeals refused Fowler's petition for discretionary
review.[8]

Fowler challenged his conviction further by filing an
Application for a Writ of Habeas Corpus Seeking Relief From Final
Felony Conviction Under [Texas] Code of Criminal Procedure,
Article 11.07 ("State Habeas Application"), which raised ten
grounds for relief.[9]  The trial court entered findings of fact and
conclusions of law, recommending that Fowler's State Habeas
Application be "dismissed" for failing to present his claims in
compliance with the form required by Rule 73.1 of the Texas Rules
of Appellate Procedure.[10]  The Texas Court of Criminal Appeals did
not follow that recommendation and instead denied relief without a
written order.[11]

Fowler now seeks federal habeas corpus relief from his arson
conviction under 28 U.S.C. § 2254 for the following reasons:

---

[7]Memorandum Opinion, Docket Entry No. 23-1, pp. 2-8 (footnote
omitted).

[8]Electronic Record, Docket Entry No. 23-9, p. 1.

[9]State Habeas Application, Docket Entry No. 23-23, pp. 5-38.

[10]State's Proposed Findings of Fact, Conclusions of Law and
Order, Docket Entry No. 23-23, pp. 74-75.  Rule 73.1 of the Texas
Rules of Appellate Procedure governs the prescribed form and other
criteria that an applicant must comply with when seeking habeas
corpus review under Article 11.07 of the Texas Code of Criminal
Procedure.  See Tex. R. App. P. 73.1.

[11]Action Taken on Writ No. 24,377-03, Docket Entry No. 23-22,
p. 1.

(1) He was prejudiced when a juror saw him in the hallway being escorted to court while wearing orange jail clothing.

(2) The State violated Article 28.10 of the Texas Code of Criminal Procedure by amending the indictment without returning to the grand jury, which resulted in a "fatal variance" between the pleading and the proof.

(3) The State destroyed the bottle of lighter fluid found at the scene before testing for Fowler's fingerprints or DNA in violation of <u>Brady v. Maryland</u>, 83 S. Ct. 1194 (1963) and <u>Arizona v. Youngblood</u>, 109 S. Ct. 333 (1988).

(4) He was denied effective assistance of counsel when his attorney failed to:

   (a) obtain records of phone calls from Fowler to the complainant asking for money;

   (b) obtain a recorded 911 call showing that Fowler called the police first before the complainant did;

   (c) call the police officer who responded to the 911 call as a witness so that he could testify that he ran the licence plate to determine the vehicle's ownership; and

   (d) call Gwen Harden, an eyewitness, to testify on his behalf.[12]

Noting that these claims were among those that were summarily denied by the Texas Court of Criminal Appeals, the respondent moves for summary judgment because Fowler fails to demonstrate that he is entitled to relief under the federal habeas corpus standard of review.[13]

---

[12]Petition, Docket Entry No. 1, pp. 6-7; Memorandum, Docket Entry No. 1-1, pp. 1-2, 5-7.

[13]Respondent's MSJ, Docket Entry No. 22, pp. 13-24.

## II. **Standard of Review**

Where the Texas Court of Criminal Appeals has denied a state habeas application without a written order, as it has in this case, that decision qualifies as an adjudication on the merits, which is subject to deference under the federal habeas corpus standard of review established by the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), 28 U.S.C. § 2254(d). See Anaya v. Lumpkin, 976 F.3d 545, 550 (5th Cir. 2020); see also Miller v. Johnson, 200 F.3d 274, 281 (5th Cir. 2000) ("Under Texas law a denial of relief by the Court of Criminal Appeals serves as a denial of relief on the merits of the claim.").[14] Under the AEDPA standard a federal habeas corpus court may not grant relief unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). Likewise, if a claim presents a question of fact, a petitioner cannot obtain federal habeas relief unless he shows that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "Because a federal habeas

---

[14]The Texas Court of Criminal Appeals has clarified that "a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits." Ex parte Torres, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).

court only reviews the reasonableness of the state court's ultimate decision, the AEDPA inquiry is not altered when, as in this case, state habeas relief is denied without an opinion." Schaetzle v. Cockrell, 343 F.3d 440, 443 (5th Cir. 2003).

The highly deferential legal standard found in § 2254(d) "imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases." Shoop v. Hill, 139 S. Ct. 504, 506 (2019). "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." Matamoros v. Stephens, 783 F.3d 212, 215 (5th Cir. 2015) (citations and internal quotation marks omitted). To constitute an "unreasonable application of" clearly established federal law, a state court's holding "must be objectively unreasonable, not merely wrong; even clear error will not suffice." Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting White v. Woodall, 134 S. Ct. 1697, 1702 (2014)). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id. (quoting Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011)).

-10-

## III. **Discussion**

### A. **The Right to a Fair Trial (Claim 1)**

Fowler's first claim for habeas corpus relief is that he was prejudiced when one of the jurors saw him being escorted by deputies while wearing orange jail clothing.[15] Fowler contends that the incident deprived him of the right to a fair trial.[16] The respondent argues that Fowler is not entitled to relief because he does not demonstrate that a constitutional violation occurred.[17]

A state criminal defendant's right to a fair trial by an impartial jury is guaranteed by the Due Process Clause of the Fourteenth Amendment. See, e.g., Cone v. Bell, 129 S. Ct. 1769, 1772 (2009); Irvin v. Dowd, 81 S. Ct. 1639, 1642 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."). "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." Estelle v. Williams, 96 S. Ct. 1691, 1692 (1976). For this reason, the use of "visible shackles" or restraints are inherently prejudicial and are prohibited during the guilt-phase of trial unless justified by a state interest specific

---

[15]Petition, Docket Entry No. 1, p. 6; Memorandum, Docket Entry No. 1-1, p. 1.

[16]Memorandum, Docket Entry No. 1-1, p. 1.

[17]Respondent's MSJ, Docket Entry No. 22, pp. 13-15.

to each trial, such as courtroom safety and security.  <u>See Deck v.</u> <u>Missouri,</u> 125 S. Ct. 2007, 2010 (2005); <u>Chavez v. Cockrell,</u> 310 F.3d 805, 808-09 (5th Cir. 2002).  Similarly, the Supreme Court prohibits requiring a defendant to appear before a jury in prison clothing because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment" and is "likely to be a continuing influence throughout the trial." <u>Williams,</u> 96 S. Ct. at 1693.

The record reflects that the trial court addressed this issue outside of the jury's presence after it received information from a bailiff that an "alternate juror potentially saw the back of [Fowler] while he was still dressed out in an orange jumpsuit, identifying him as a prisoner," while he was being escorted to court that morning.[18]  Defense counsel asked the trial court to question the alternate juror to determine what she saw, if anything, that might affect the presumption of innocence.[19]  The trial court noted that defense counsel's concerns about the presumption of innocence were "somewhat overstated" because the jury had already heard a substantial amount of evidence against Fowler at that point, and the trial was "one witness away from the State's case being closed."[20]  The trial court agreed to instruct

---

[18]Court Reporter's Record - Jury Trial Proceedings, vol. 5, Docket Entry No. 23-16, p. 6.

[19]<u>Id.</u> at 6-7.

[20]<u>Id.</u> at 7.

the jury that "nothing outside of sworn testimony and evidence can be considered" and proceeded to question the alternate juror.[21] The alternate juror acknowledged that she arrived early that morning and that she saw the bailiff ("Deputy Glover") in the hallway.[22] The trial court asked the alternate juror if she saw the defendant in the hallway, and she replied that she had not.[23] After trial resumed, the State proceeded to call one last witness and then rested its case.[24]

Fowler insists that the alternate juror lied about seeing him in the hallway and that, after viewing him "jail house orange," she was allowed to enter the jury room and "prejudice the entire jury against [him]."[25] Fowler has presented no evidence in support of his claim that the alternate juror lied about seeing him dressed in prison garb. The jury was polled after the guilty verdict was announced and there is no evidence that the alternate juror served during deliberations.[26] There is also no evidence that any juror who did serve was tainted or biased against him. The Fifth Circuit has emphasized that "bald assertions" unsupported by evidence and

---

[21]Id. at 7-8.

[22]Id. at 8.

[23]Id. at 8-9.

[24]Id. at 12-43.

[25]Memorandum, Docket Entry No. 1-1, p. 1.

[26]Court Reporter's Record - Argument Proceedings, vol. 6, Docket Entry No. 23-17, pp. 28-29.

"mere conclusory allegations do not raise a constitutional issue in a habeas proceeding." Ross v. Estelle, 694 F.2d 1008, 1011-12 (5th Cir. 1983) (per curiam) (citing Schlang v. Heard, 691 F.2d 796, 798 (5th Cir. 1982) (collecting cases)). Because Fowler has presented no evidence in support of his claim, he fails to demonstrate that the state court's decision was unreasonable or that relief was improperly denied by the Texas Court of Criminal Appeals. As a result, Fowler fails to show that he is entitled to relief under 28 U.S.C. § 2254(d).

## B. Sufficiency of the Indictment (Claim 2)

Fowler argues that the indictment in this case was invalid because the State improperly amended the charges against him two days before the start of his trial without returning to the grand jury for their approval.[27] Fowler contends that the State violated Article 28.10 of the Texas Code of Criminal Procedure,[28] which provides as follows:

(a) After notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences. On the request of the defendant, the court shall allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment or information.

(b) A matter of form or substance in an indictment or information may also be amended after the trial on

---

[27]Memorandum, Docket Entry No. 1-1, p. 2.

[28]Id.

-14-

the merits commences if the defendant does not object.

(c) An indictment or information may not be amended over the defendant's objection as to form or substance if the amended indictment or information charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced.

Tex. Code Crim. Proc. art. 28.10. Fowler appears to argue that the State's failure to amend the indictment properly in compliance with Article 28.10 resulted in a "fatal variance" between his indictment and the proof presented at trial.[29]

In a federal habeas proceeding under 28 U.S.C. § 2254 a petitioner's claim of fatal variance between his indictment and the proof presented at trial is construed as an attack on the sufficiency of the indictment, which implicates the trial court's jurisdiction. See, e.g., Williams v. Collins, 16 F.3d 626, 637 (5th Cir. 1994). The Fifth Circuit has held that "the sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction." Evans v. Cain, 577 F.3d 620, 624 (5th Cir. 2009) (per curiam) (emphasis in original) (citing Branch v. Estelle, 631 F.2d 1229, 1233 (5th Cir. Unit A 1980); McKay v. Collins, 12 F.3d 66, 68 (5th Cir. 1994)). "State law dictates whether a state indictment is sufficient to confer a court with jurisdiction." Williams, 16 F.3d at 637 (citation

---

[29]Id.

omitted). The Supreme Court has repeatedly held that "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 112 S. Ct. 475, 480 (1991); Lewis v. Jeffers, 110 S. Ct. 3092, 3102 (1990); Pulley v. Harris, 104 S. Ct. 871, 874-75 (1984).

The respondent contends that Fowler's challenge to the sufficiency of his indictment is not actionable on federal habeas corpus review because his claim concerns an alleged violation of state law.[30] The respondent notes that Fowler's claim was rejected by the Texas Court of Criminal Appeals on state collateral review, which constitutes an implicit finding that the indictment was sufficient to confer jurisdiction on the trial court.[31] As the respondent correctly observes, the issue is foreclosed from consideration on federal habeas review if "the sufficiency of the [indictment] was squarely presented to the highest court of the state on appeal, and that court held that the trial court had jurisdiction over the case." Wood v. Quarterman, 503 F.3d 408, 412 (5th Cir. 2007) (citation omitted). Because the Texas Court of Criminal Appeals rejected Fowler's claim that the indictment was invalid and necessarily found that it was sufficient to vest the trial court with jurisdiction, this court need not address that issue. See id.; see also Evans, 577 F.3d at 624 (citing McKay, 12 F.3d at 68).

---

[30]Respondent's MSJ, Docket Entry No. 22, pp. 15-16.

[31]Id. at 16.

-16-

Fowler fails to otherwise show that his indictment was amended improperly in violation of Article 28.10 or that a fatal variance occurred. The record reflects that on September 20, 2018, Fowler was arraigned in open court before the start of his trial.[32]  The indictment that was returned by the grand jury against Fowler on October 27, 2016, was read into the record and he entered a plea of not guilty.[33]  The record further reflects that on September 21, 2018, a handwritten change was made to the indictment that was returned by the grand jury on October 27, 2016, to correct a typographical error in the spelling of a word.[34]  On the first day of trial, Fowler was arraigned before the jury, where the same charges were read into the record.[35]  The intermediate court of appeals reviewed the proof presented at trial and concluded that there was sufficient evidence to support Fowler's conviction on the charged arson offense.  See Fowler, 2019 WL 6314907, at *3-6. Fowler does not show that his claim has merit or that the state court unreasonably denied him relief.  Accordingly, the respondent is entitled to summary judgment on this claim.

---

[32]Court Reporter's Record - Arraignment Proceedings, vol. 2, Docket Entry No. 23-13, pp. 3, 4.

[33]Id. at 5.

[34]See Indictment, Docket Entry No. 23-10, p. 10 (crossing out the word "ignighting [sic]" and replacing it with "igniting").

[35]Court Reporter's Record - Jury Trial Proceedings, vol. 4, Docket Entry No. 23-15, pp. 11 12.

17-

## C. Destruction of Evidence (Claim 3)

The complainant's girlfriend testified that she saw Fowler squeeze a bottle of lighter fluid onto a vehicle owned by the complainant, igniting it on fire approximately ten minutes after Fowler had banged on the complainant's front door, screaming and demanding money.[36] The complainant testified that he also saw Fowler holding a bottle of lighter fluid that had been taken from the front porch of the complainant's home.[37] A police officer who investigated the offense testified that he observed a bottle of lighter fluid on the ground near the vehicle.[38] Fowler contends that the State destroyed the bottle of lighter fluid that was allegedly used to ignite the vehicle without affording him the opportunity to test it for fingerprints or DNA.[39] By destroying evidence that was potentially useful to his defense, Fowler contends that the State violated his right to due process under Brady v. Maryland, 83 S. Ct. 1194 (1963), and Arizona v. Youngblood, 109 S. Ct. 333 (1988).[40]

In Brady the Supreme Court held that the government violates due process when it fails to disclose evidence favorable to the

---

[36]Id. at 74-75, 79-80, 93-94.

[37]Id. at 58, 60, 67-68.

[38]Id. at 105, 109-11.

[39]Memorandum, Docket Entry No. 1-1, p. 5.

[40]Id. at 5-6.

accused if such evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 83 S. Ct. at 1196-97. To prove a <u>Brady</u> claim a petitioner "must show three things: (1) the evidence at issue is favorable to the defense, either because it is exculpatory or impeaching, (2) the prosecution suppressed the evidence, and (3) the evidence is material." <u>Murphy v. Davis</u>, 901 F.3d 578, 597 (5th Cir. 2018) (citing <u>United States v. Brown</u>, 650 F.3d 581, 587-88 (5th Cir. 2011)). "Suppressed evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Id.</u> (quoting <u>United States v. Bagley</u>, 105 S. Ct. 3375, 3383 (1985)).

Fowler alleges that the State violated <u>Brady</u> by destroying evidence, <u>i.e.</u>, the bottle of lighter fluid, that might have been useful to his defense if testing had been done to determine that his fingerprints and DNA were not present. To demonstrate a due process violation where the destruction of evidence is alleged, the defendant must demonstrate that (1) the State destroyed evidence whose exculpatory value was "apparent before the evidence was destroyed"; and (2) the defendant was unable to "obtain comparable evidence by other reasonably available means." <u>California v. Trombetta</u>, 104 S. Ct. 2528, 2534 (1984). If the exculpatory value of the evidence is undetermined, but may be "potentially useful" to the defense, then a defendant must show that the government acted

with bad faith in destroying the evidence. Youngblood, 109 S. Ct. at 337. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id.; Illinois v. Fisher, 124 S. Ct. 1200, 1202 (2004) (per curiam) (The failure to preserve potentially useful evidence "does not violate due process 'unless a criminal defendant can show bad faith on the part of the police.'") (quoting Youngblood, 109 S. Ct. at 337).

Fowler's claim fails because he does not demonstrate that the bottle of lighter fluid was destroyed. The record shows that the bottle of lighter fluid was preserved by the arson investigator, who collected it at the scene and placed it in an evidence bag.[41] The arson investigator also collected swabs from the vehicle and samples of burned debris, placing everything he collected in an evidence locker.[42] A forensic scientist at the arson laboratory tested the swabs and debris collected by the arson investigator to

[41]Court Reporter's Record - Jury Trial Proceedings, vol. 4, Docket Entry No. 23-15, pp. 139-40, 142-45, 159-60; State's Exhibits 23 and 24, Court Reporter's Record - Exhibits, vol. 10, Docket Entry No. 23-21, pp. 28-29 (photographs depicting bottle of lighter fluid on the ground near the burned vehicle); State's Exhibit 27, Court Reporter's Record - Exhibits, vol. 10, Docket Entry No. 23-21, p. 32 (photograph depicting evidence bag with bottle of lighter fluid inside).

[42]Court Reporter's Record - Jury Trial Proceedings, vol. 4, Docket Entry No. 23-15, pp. 145-47, 152; State's Exhibits 29 and 30, Court Reporter's Record - Exhibits, vol. 10, Docket Entry No. 23-21, pp. 33-34 (photographs depicting metal cans containing swabs and fire debris).

-20-

determine whether an ignitable liquid or accelerant was used to start the fire.[43] She admitted on cross-examination that she did not test the bottle of lighter fluid for fingerprints or DNA because testing of that kind was conducted at a different laboratory facility, and not at the arson laboratory.[44]

During closing argument defense counsel argued that the arson investigator "did not do his job" because he did not ask for the bottle of lighter fluid to be tested for fingerprints or DNA.[45] There is no indication, however, that the bottle of lighter fluid was not tested because it was destroyed. Instead, the record reflects that the bottle was not tested because the State did not request it. Absent a showing that exculpatory or potentially useful evidence was destroyed by the State in bad faith, Fowler does not demonstrate that a violation of due process occurred or that the state court's decision to deny relief was contrary to or unreasonable under Brady or Youngblood. Therefore, the respondent is entitled to summary judgment on this claim.

---

[43]Court Reporter's Record - Jury Trial Proceedings, vol. 5, Docket Entry No. 23-16, pp. 23-33; State's Exhibits 33 and 34, Court Reporter's Record - Exhibits, vol. 10, Docket Entry No. 23-21, pp. 37-66 (laboratory reports from the Texas Department of Insurance State Fire Marshal's Office - Forensic Arson Laboratory).

[44]Court Reporter's Record - Jury Trial Proceedings, vol. 5, Docket Entry No. 23-16, pp. 40-42.

[45]Court Reporter's Record - Argument Proceedings, vol. 6, Docket Entry No. 23-17, p. 11.

-21-

## D. Ineffective Assistance of Counsel (Claim 4)

Fowler's final claim is that his defense counsel was deficient for failing to investigate by obtaining phone records and a recorded 911 call.[46] Fowler alleges further that defense counsel failed to present testimony from two witnesses.[47] Claims for ineffective assistance of counsel are governed by the standard announced in Strickland v. Washington, 104 S. Ct. 2052 (1984). To prevail under the Strickland standard a criminal defendant must demonstrate (1) that his counsel's performance was deficient and (2) that the deficient performance resulted in prejudice. Id. at 2064. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id.

To satisfy the deficient-performance prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 104 S. Ct. at 2064. This is a "highly deferential" inquiry that requires "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 2065. "It is only when the lawyer's errors were so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment that Strickland's first prong is satisfied." Buck v.

---

[46]Memorandum, Docket Entry No. 1-1, p. 7.

[47]Id.

<u>Davis,</u> 137 S. Ct. 759, 775 (2017) (citation and internal quotation marks omitted).

To satisfy the prejudice prong "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland,</u> 104 S. Ct. at 2068. A habeas petitioner must "affirmatively prove prejudice." <u>Id.</u> at 2067. A petitioner cannot satisfy the second prong of <u>Strickland</u> with mere speculation and conjecture. <u>See Bradford v. Whitley,</u> 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations are insufficient to demonstrate either deficient performance or actual prejudice. <u>See Day v. Quarterman,</u> 566 F.3d 527, 540-41 (5th Cir. 2009).

### 1. <u>Failure to Investigate</u>

Fowler alleges that his defense counsel's investigation was deficient because he failed to obtain evidence of "over one hundred and fifty [phone] calls from [Fowler] to [the complainant] requesting [that his] money be returned."[48] Fowler contends that his defense counsel also "declined" to obtain a recording of a 911 call that would have shown that "the only reason the complainant called the police is because Fowler called the police on him first."[49]

---

[48]Memorandum, Docket Entry No. 1-1, p. 7.

[49]<u>Id.</u>

A habeas corpus petitioner who alleges a failure to investigate on the part of his counsel must state with specificity what the investigation would have revealed and how it would have changed the outcome of his trial. See Miller v. Dretke, 420 F.3d 356, 361 (5th Cir. 2005) (citing United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989)). Fowler does not present any phone records or a recording of the 911 call that he allegedly made to police. Likewise, Fowler does not allege facts showing that the result of his trial would have been different if his counsel had obtained this evidence and presented it to the jury. Fowler's conclusory allegations are insufficient to demonstrate deficient performance or actual prejudice. See Lincecum v. Collins, 958 F.2d 1271, 1279 (5th Cir. 1992) (denying habeas relief where petitioner "offered nothing more than the conclusory allegations in his pleadings" to support his claim that counsel was ineffective for failing to investigate and present evidence). Accordingly, Fowler is not entitled to relief on this claim.

2.    Failure to Call Witnesses

Fowler contends that his defense counsel was deficient for failing to call the police officer who responded to the 911 call that Fowler allegedly made to police about the complainant.[50] According to Fowler, this unidentified officer ran a license-plate check when investigating the call, which showed that the

---

[50]Id.

complainant did not own any of the vehicles in his yard.[51] Fowler also contends that his defense counsel refused to call Gwen Harden, whom Fowler describes as the mother of one of the complainant's children, because "she was eyewitness to it all."[52]

"Claims of uncalled witnesses are disfavored, especially if the claim is unsupported by evidence indicating the witnesses'[] willingness to testify and the substance of the proposed testimony." Gregory v. Thaler, 601 F.3d 347, 352 (5th Cir. 2010) (citing Harrison v. Quarterman, 496 F.3d 419, 428 (5th Cir. 2007)). A petitioner who alleges ineffective assistance of counsel based on the failure to call either a "lay [or] expert witness[]" must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to the particular defense." Day, 566 F.3d at 538 (citations omitted). Absent a showing that a particular witness would have offered testimony favorable to the defense, the petitioner's claim is speculative and conclusory, and does not demonstrate either deficient performance on his counsel's part or resulting prejudice to petitioner's defense. See Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001).

Fowler does not identify the police officer who responded to the 911 call that he made, and he does not show that the officer

---

[51]Id.

[52]Id.

-25-

was available or that he would have testified on Fowler's behalf if he had been called. Fowler further fails to provide any information about what, if anything, Gwen Harden would have said if she had been called to testify.[53] Fowler's unsupported allegations are insufficient to establish that his counsel's performance was deficient or that he suffered prejudice as a result. See Day, 566 F.3d at 538; Sayre, 238 F.3d at 636. Accordingly, Fowler fails to show that he was denied effective assistance by his counsel or that the state court's decision to deny relief was unreasonable under the Strickland standard. Absent a valid claim for relief, Fowler does not show that he is entitled to a federal writ of habeas corpus under 28 U.S.C. § 2254(d), and his Petition must be dismissed.

## IV. Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. A certificate of appealability will not issue unless the petitioner

---

[53]The complainant testified that he received a call from a "lady that was outside" on the night of the offense, warning him that Fowler was outside of his house and that he had lighter fluid and a lighter in his hand. Court Reporter's Record - Jury Trial Proceedings, vol. 4, Docket Entry No. 23-15, pp. 33, 62-63, 65. The caller was identified as "Miss Hardin." Id. at 66. If she is the same eyewitness that Fowler claims his defense counsel should have called, it is not clear that her testimony would have been helpful to his defense.

makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that 'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" Tennard v. Dretke, 124 S. Ct. 2562, 2565 (2004) (quoting Slack v. McDaniel, 120 S. Ct. 1595, 1604 (2000)). Under the controlling standard this requires a petitioner to show that "jurists of reason could disagree with the [reviewing] court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Buck, 137 S. Ct. at 773 (citation and internal quotation marks omitted).

After careful review of the pleadings and the applicable law, the court concludes that reasonable jurists would not find the assessment of the constitutional claims debatable or wrong. Because the petitioner does not demonstrate that his claims could be resolved in a different manner, a certificate of appealability will not issue in this case.

## V.  Conclusion and Order

The court **ORDERS** as follows:

1. Respondent's Motion for Summary Judgment (Docket Entry No. 22) is **GRANTED**.

2. Petitioner's Motion for Dismissal of Charges and Conviction (Docket Entry No. 24) is **DENIED**.

3. The Petition for a Writ of Habeas Corpus By a Person in State Custody filed by David Fowler (Docket Entry No. 1) is **DENIED**, and this action will be dismissed with prejudice.

4. A certificate of appealability is **DENIED**.

The Clerk shall provide a copy of this Memorandum Opinion and Order to the parties.

**SIGNED** at Houston, Texas, on this the 30th day of June, 2021.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE